LEHAN, Judge.
Appellants suffered a very unfortunate, emotional setback from this case. As a result of the judgment denying their petition for adoption, they lost the opportunity to adopt the child of whom they had custody for approximately sixteen months.[1] The natural, biological, birth mother prevailed.
We very much sympathize with appellants. However, in order to keep this case in perspective, two aspects should be noted which indicate that appellants are not free from any responsibility for all that transpired.
First, appellants in effect contend in their motions for post judgment relief, the denial of which is now before us on this appeal, that the mother is unfit to be the parent of her child. This is a contention which was made by them on their prior appeal to this court when the judgment was affirmed and had also apparently been made in their argument to the trial court before the judgment was entered. But a contention of that kind is not properly made in this adoption suit brought under chapter 63, Florida Statutes (1985). Chapter 39 provides the method by which the natural mother’s fitness could have been challenged. Chapter 39 sets out the procedures, standards, and safeguards for that type of case. This court took the unusual step of specifically advising appellants in January of this year that a suit under chapter 39, not this adoption proceeding, would have provided the method of challenging the natural mother’s fitness.
The only real issue in this adoption case has been whether the natural mother made her child available for adoption by consenting to an adoption. There has never been, nor could there properly be, an issue in this case as to the fitness of the natural mother. Nor have there been any trial court findings in that regard. Appellants’ attempted arguments in that regard have been only that — arguments—and have never been litigated or ruled upon as they could have been if the appropriate proceeding for that purpose had been filed. Why such a proceeding has not been filed if, as appears from these continued contentions in this case, it has not been, we do not know.
Unfitness, as such, is not the literal basis for chapter 39 dependency proceedings. But that chapter, by specifying the grounds upon which a child may be taken from a parent, in effect provides the legal basis for a determination that a person is unfit to serve as the parent of the child. If there are to be other grounds, that is for the legislature to decide. Thus, if appellants feel that the natural mother should be declared unfit but cannot be so declared under chapter 39, their argument should be addressed to the legislature, not the courts.
We should point out that if contentions of that kind are ever made only to try to cause a child to be made available for adoption by showing that would-be adoptive parents would be better parents to the child than the child’s unconsenting natural parent or parents, those contentions would have no place whatsoever in either an adoption proceeding or a chapter 39 proceeding. How many parents could potentially be shown in a legal proceeding to be less good for their children than certain other would-be adoptive parents if the courts were empowered in such a proceeding to cause the adoption of children on that basis?
We should also point, out that even if a chapter 39 proceeding had been brought and appellants had prevailed, that would not have assured the adoption of the child by them. But the child could then have become available for adoption which is at the bottom of what this case is about.
Second, when appellants took custody of the child, they apparently knew that the natural mother had withdrawn her consent to permit the adoption of her child by anyone. That is indicated in the trial court’s order which is quoted below. The mother withdrew her consent about a week after she had signed the consent form. HRS, *347 which was actively involved, knew that the mother had withdrawn her consent and apparently so advised appellants. Thus, the natural mother did not mislead appellants or any would-be adoptive parents into thinking that she agreed that they could become the parents of her child. Appellants assumed the risk that they would not be. As the trial court specifically found, HRS gave appellants “the ‘choice’ of trying to live with an adverse ruling,” i.e., a ruling that the mother had not consented to an adoption of her child and that appellants would therefore not be permitted to adopt the child. It is the very understandable difficulty of living with that choice which has been a substantial cause of their setback.
We will now describe the proceedings which resulted in the judgment which denied appellants’ petition for adoption and the proceedings subsequent to that judgment up to the time of this appeal.
The judgment denying appellants’ petition for adoption was entered by the trial court on the basis of its determination that the natural mother, about a week after she had consented to the adoption of her child and before appellants took custody of the child, had validly revoked her consent. Section 63.082(5), Florida Statutes (1985), provides that a “[cjonsent [to an adoption] may be withdrawn only when the court finds that the consent was obtained by fraud or duress.” The trial court found that the natural mother’s consent had been revocable and had been effectively revoked because it had been given under such personal pressure from her fear of a forthcoming arrest and jail based upon statements to her by a detective (and, in fact, she was then jailed) as to impair her ability to make rational decisions and to constitute duress. The judgment included findings that
The Mother ... is a woman of limited intelligence. According to the psychological testimony, she has an I.Q. of approximately 83. Her state of mind at the time of this incident was such that she would have unusual difficulty making a rational decision under stress. The testimony which the Court accepts as true is that she would have “locked” her position and would have refused to rationally consider available alternatives.
The trial court was also concerned with another aspect of the circumstances under which the natural mother’s consent had been given. The judgment said in that regard,
It is of great interest that the Mother did not appear for her interview with [the intermediary attorney] to whom she was referred by HRS representatives [for the purpose of arranging for the execution of her consent to the adoption]. She was recruited to some extent as was shown by the fact that the secretary [for the attorney] called the Mother and then arranged transportation. Although the Mother was told in glowing terms of the future her child could expect, the court finds that very little real effort was made to determine if the consent was in fact voluntary. What efforts were made were simply pro forma.
In a footnote the trial court referred to the attorney’s secretary having sent a taxi for transportation for the natural mother to the attorney’s office and having thereafter given her $40.00, which was for the taxi ride home and the child’s possessions. The mother’s car had broken down which was the reason she had given the attorney for not keeping the appointment. The mother’s testimony was that her car had broken down but that she had not kept the appointment with the attorney because she was considering not going through with consenting to the adoption and that, after not having answered the telephone when the secretary first called, she answered it and was then hurried. Her testimony was that on the first day after the execution of her consent, while she was in jail, she tried, without success, to contact her mother to take steps to withdraw her consent and on that same day wrote to the public defender for the same purpose.
Appellants then appealed to this court, contending that the judgment was erroneous because duress justifying a revocation of an adoption consent could not result from what they characterized as only internal, subjective pressure on the mother re- *348 suiting from the threat of criminal prosecution and jail. They also argued to the effect that her consent was not recruited and that when she had confirmed to an HRS representative later that same day that she had signed the consent form, she had said nothing about her fear of arrest and jail. That argument, and others similar to it, however, appears to have asked for a reweighing of sufficient evidence as to the natural mother’s credibility which, as the Florida Supreme Court has definitely established, cannot be the province of an appellate court. See Tibbs v. State, 397 So.2d 1120 (Fla.1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); Tsavaris v. NCNB National Bank, 497 So.2d 1338 (Fla. 2d DCA 1986).
In that previous appeal the judgment was affirmed. E.H. v. K.S., 500 So.2d 1354 (Fla. 2d DCA 1986). That judgment is not, and cannot be, the basis for this second appeal. The reasons why losing parties in a lawsuit are not entitled to second appeals —or, for that matter, third or fourth appeals — is obvious. Litigation cannot go on perpetually but must end after the right to appeal has been availed of and the appeal has been ruled upon, as it was here.
Before and after the judgment was affirmed on that previous appeal, appellants filed in the trial court a motion for post judgment relief based upon new evidence. The trial court denied those motions. The denial of those motions is the basis for this appeal. Appellants contend on this appeal that the trial court erred in its denial of the post judgment motions by concluding that the new evidence, even if it had been available previously, would not have changed the outcome. They argue that that was error because, just as they argued to the trial court before the entry of the judgment, to this court on the prior appeal, and to the trial court in support of their motions for post judgment relief, the natural mother’s consent could not properly be found to have been given under duress. Their arguments that duress did not exist are now on the basis that the new evidence showed that the mother made misrepresentations to the trial court in her prior testimony and that her consent represented a rational decision. The thrust of their arguments is the contention that, notwithstanding what the prior evidence by itself showed, the new evidence shows that the mother’s consent to the adoption was not given under duress.[2]
While they appear in this appeal in their own behalf and without counsel, they were well represented in the trial court and in their previous appeal by counsel who vigorously presented their case. For the reasons explained below, we affirm the trial court’s denial of appellants’ motions for post judgment relief, which is what is now before us.
This case is of a nature susceptible to misunderstanding. Perceiving what this case actually involves requires considering what a decision one way or the other would mean as precedent controlling other adoption cases in the future and also considering the separation of what this case involves for the natural mother and the appellants from contentions which the appellants have mistakenly asserted that this case involves. This opinion undertakes to address both of those considerations. It does so in some depth.
But first we will summarize in the following paragraphs (a) through (d) the remainder of this opinion which gives the reasons why this case must be affirmed on this appeal:
(a) The trial court, in denying the motions for post judgment relief, determined that the new evidence providing the basis of those motions was essentially consistent with the previous evidence on the basis of which the judgment, which was affirmed on the previous appeal, had been entered. We are required to defer to the discretion of the trial court in that determination. Thus, appellants’ argument on this appeal must be considered to be on substantially the same factual basis as that of their *349 previous appeal. But an appeal cannot be permitted to be simply another argument of the facts which, under the law of the case established by the appellate court on a previous appeal, has been decided against appellants. That law of this case is that duress on the natural mother at the time she signed the consent could have been and was, under the facts, properly found by the trial court to have existed and that, therefore, the trial court was correct in finding that she effectively revoked the consent.[3] Accordingly, the trial court’s denial of the motions for post judgment relief must be affirmed.
(b)We recognize that an appellate court is not always necessarily bound absolutely by the law of the case. Exceptional circumstances under which an appellate court is permitted to reconsider the law of the case established previously by that court in the same case are set forth in Strazzulla v. Hendrick, 177 So.2d 1, 4 (Fla.1965), where the Florida Supreme Court said,
[A]n appellate court should reconsider a point of law previously decided on a former appeal only as a matter of grace, and not as a matter of right; ... an exception to the general rule binding the parties to “the law of the case” ... at all subsequent proceedings should not be made except in unusual circumstances and for the most cogent reasons — and always, of course, only where “manifest injustice” will result from a strict and rigid adherence to the rule.
See also Preston v. State, 444 So.2d 939, 942 (Fla.1984); Cousins Construction Co. v. Black, Crow & Eidsness, Inc., 488 So.2d 838, 842 (Fla. 2d DCA 1986). Thus, the key to whether we may reconsider the law of this case in order to determine whether the trial court’s denial of the motions for post judgment relief may be reversed is whether to affirm would result in manifest injustice. We conclude that when this case is viewed in the correct perspective, there is no such injustice and that we are, as we said in (a) above, bound to follow the prior affirmance of the judgment.
(c) The other contentions which appellants have made that the natural mother is unfit to be the lawful parent of her child and also that a court should decide that it is in the best interests of the child that the child be available for adoption do not involve, and never have involved, the determinative issue in this adoption case. The inappropriateness of the contention as to the mother’s unfitness has been referred to above and will again be referred to below. The contention as to the best interests of the child asserts in effect that a court in an adoption case like this can require that a child be available for adoption simply on the basis that that would be in the child’s best interests, without there having been a chapter 39 proceeding deciding the natural parent is unfit. For reasons explained below, that contention, if accepted, would promulgate a public policy applicable to parents who do not consent to the adoption of their children which could disrupt our society and has not been approved by the legislature. That contention involves an issue which is logically separate and apart from the issue in this case which has been whether the child was not available for adoption by anyone because the mother’s consent was revocable as having been given under duress and was therefore effectively revoked.
(d) For the reasons summarized in (a) and (b) above, we should not and do not reconsider the law of this case in order to decide this appeal. Nonetheless, observations will be made in this opinion as to reasoning which supports the soundness of that law as applied to the facts of this case.
Now we will explain in more detail those summarized reasons.
The trial court’s basis for denying the motions for post judgment relief was, in the words of that court, primarily that
2. Even if the [new] evidence of the natural Mother’s activities ... could be
*350 considered, such evidence would not, “probably change the result.” City of Winter Haven v. Tuttle/White Constructors, Inc., 370 So.2d 829, 831 (2d DCA 1979). Those actions [conduct of the mother indicated in the new evidence] appear to be consistent with her behavior in the past and with the conclusions presented by Dr. Trieloff [expert psychologist] that her ability to make reasonable and rational decisions under pressure is impaired.
3. The natural Mother presented no false testimony that would warrant setting aside the Judgment.
The order went on to provide more specific reasons why the court concluded that the new evidence would not have changed the result.[4]
The standard of review for determining on appeal the correctness of the denial of those motions, which is all that is now before us, is whether the trial court abused its discretion. This standard was referred to in Ashland Oil, Inc. v. Pickard, 289 So.2d 781 (Fla. 3d DCA 1974), where the Third District Court of Appeal pointed out that “[r]elief from judgment ... is directed to the sound discretion of the court and cannot be invoked as a matter of right.” Id. at 782. See Lewis v. Jennings, 64 So.2d 275, 277 (Fla.1953). See also 33 Fla.Jur.2d Judgments § 391 (1982); 49 C.J.S. Judgments § 300 (1947).
It has been firmly established by the Florida Supreme Court that the appellate test for determining whether there was an abuse of discretion on the part of a trial court is only to determine whether “no reasonable man would take the view adopted by the trial court.” Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980). That is, “If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.” Id.
Appellants argue that the new evidence is different in nature from the prior evidence. We cannot agree because we cannot conclude under the foregoing test that the trial court abused its discretion in finding otherwise. We emphasize what the Florida Supreme Court has established as the standard of review which is to be employed. In Canakaris the Florida Supreme Court said, in addition to what we have quoted above, that “where the action of the trial judge is within his judicial discretion ... the manner of appellate review” is determined by defining “judicial discretion ... as: ‘The power exercised by courts to determine questions to which no strict rule of law is applicable but which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court.’ ” Id. at 1202. The supreme court went on to admonish that,
Our trial judges are granted this discretionary power because it is impossible to establish strict rules of law for every conceivable situation.... The trial judge can ordinarily best determine what is appropriate and just because only he can personally observe the participants and events of the trial.
* * # * * *
In reviewing a true discretionary act, the appellate court must fully recognize the superior vantage point of the trial judge and should apply the “reasonableness” test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.
Id. at 1202-03. Canakaris has been cited, and the foregoing propositions have been followed, by all Florida District Courts of Appeal an exceptionally large number of times.
Careful consideration compels the conclusion that there was no abuse of discretion under that test. The new evidence *351 by itself does not require a conclusion contrary to that which the trial court reached in denying the motions. More to the point, that evidence, at best, shows only that reasonable men could have differed with the trial court’s conclusion. That is, at best it can only be said that reasonable men could have differed with the conclusion in the above quoted portion of the order that the new evidence is basically consistent in nature with the prior evidence.
Yet that discretionary conclusion leads to an affirmance of the order denying the post judgment motions only if the foregoing law of the case must be followed. That is, an affirmance of this case is required from that conclusion by the trial court only if evidence of the nature of the evidence which had been before the trial court at the time it entered the judgment— which, as the trial court concluded, was not inconsistent with the new evidence before the court under the post judgment motions — justified a conclusion under the law of the case that the natural mother’s consent had been given under duress. Whether that law of the case established by this court’s prior affirmance of the judgment was correct was not a matter for the discretion of the trial court. As the supreme court said in one of the foregoing quotations from Canakaris, discretionary authority of trial courts exists only in situations “as ... to which no strict rule of law is applicable but which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court.” 382 So.2d at 1202. The issue of what may properly, as a matter of law, constitute duress in this kind of case is something to which a more or less strict rule of law may be applicable. A rule of law of that nature was embodied in the law of this case.
We will now explain the reasons why, as we have said in (b) above, we must follow that law of this case, i.e., why, under the test set forth in Strazzulla, there is no manifest injustice from our doing so.
In determining pursuant to the Strazzul-la test whether there was manifest injustice from finding duress on the mother to have existed and from permitting, as did the trial court in the judgment and in the order denying the motions for post judgment relief, and as did this court in the prior affirmance of the judgment, the natural mother to remain the parent of her child, a correct perspective is essential. Appellants would like to include in that perspective their contentions that the natural mother is unfit to be the parent of her child and that the best interests of the child would be served if she were not. Appellants are, in our firm view, mistaken. As indicated above and as we will explain further below in what we will describe as our explanation of what this appeal does not involve, those arguments have never been a proper part of this case and have never been ruled upon by the trial court or by this court and will not be ruled upon now.
Thus, the perspective from which to view this case in determining whether there would be manifest injustice from not permitting appellants to be the child’s parents and not permanently terminating the natural mother’s parental rights concerns at this point the respective positions of the natural mother and appellants vis a vis each other.
To reiterate, this adoption case has involved whether the natural mother consented to her child being available for adoption. Unless she did so appellants were not entitled to petition for the adoption of the child. The only issue which has been properly in this case has been whether the natural mother’s consent was not in force because it was effectively revoked by her. And, as we have said, the determinative issue now before us is whether, viewed in the correct perspective, it was manifest injustice for the trial court to have found that she did not consent because her consent had been revoked. If there was no such manifest injustice, the law of the case, which is that duress may be found to exist under the particular circumstances of this case, must be followed. There are two reasons which we will now explain why there was no manifest injustice. The first concerns the natural mother. The second concerns appellants.
*352 As to the reason concerning the natural mother, she did not mislead appellants and was not the proximate cause of their pain. She withdrew her consent about a week after it had been given and before appellants took custody of, and developed their love for, the child. As to the reason concerning the appellants, the record indicates that they took custody of the child knowing, as did HRS, that the natural mother’s consent to the adoption had been withdrawn. As the trial court said in its order denying appellants’ motion for post judgment relief, “HRS took it upon themselves to interpret the law [as to whether the natural mother could effectively withdraw her consent about a week later] and give the Petitioners [appellants] the ‘choice’ of trying to live with an adverse ruling.” Appellants took that choice and are now suffering the consequences. They are suffering deeply but not through the fault of the natural mother. This sad state of affairs is not injustice or manifest injustice requiring that we now depart from the law of the case and take the child from the natural mother. We . certainly understand appellants’ feelings of enormous loss. But, again, that loss evidently resulted after appellants’ own decision, when or about the time they took custody of the child, to try, if there were ultimately an adverse ruling against them as there has been, to live with that ruling. Also, there should be no ignoring the enormous loss which would surely occur to a natural mother if her child were taken away from her.[5]
If this is hard for appellants to accept, as of course it is since the love for a child is involved, it can only be because, while they know they assumed the risk of this devastation to them, they argue that the natural mother is unfit to be the child’s mother and that the child’s best interests would be served if the child were not. But we must say again that those arguments are not, never have been, nor should they have been a part of this chapter 63 adoption case.
Appellants’ argument, stripped of matters properly belonging in another suit or within the proper discretion of the trial court, is thus not that manifest injustice has occurred in this case but is basically an argument of law said to be applicable to any adoption case. It is an argument that the foregoing law of this case is incorrect. While, as we have explained, the law of the case must be followed here, we will nonetheless address that argument. The argument is that in any adoption case — even where the natural mother is, beyond any question, a fit and proper mother of her child, and even where the child’s interests, beyond any question, would be best served by the child being with the mother — no mother can withdraw her consent to the adoption of her child about a week later unless her consent was obtained by fraud or unless some third party improperly obtained that consent from her by what the law would call duress in other circumstances, for example, where a party attempts to revoke a contractual agreement. Such other circumstances commonly involving the law of duress could include a party trying to back out of an agreement to purchase an automobile. In that circumstance the law generally is that the agreement could effectively be revoked by a signatory to the agreement due to duress only if another party had improperly imposed pressure to cause the signatory to enter into the agreement against his free will. Appellants’ argument, in the final analysis, can be taken to be that even though the natural mother, when she gave her consent to HRS, was under great personal pressure which, as the trial court found, impaired her ability to make rational decisions, she should be bound by the decision to lose her child. In essence, the argument is that a deal with HRS is a deal. But HRS’s interests should not be determinative. That is, the administrative steps which were taken by HRS during that week following the mother’s execution of the consent form should not be a part of our perspective in determining whether there was a manifest injustice to *353 appellants in this case from permitting the natural mother to keep her child.
We recognize that appellants’ argument incorporates other legitimate legal contentions that the law of this case was incorrect. For example, the wording of section 63.082(5), which provides the grounds upon which a parent’s consent to an adoption can be withdrawn, is, as we have said, that a parent’s consent may be withdrawn “only when the court finds that the consent was obtained by fraud or duress.” No fraud was involved here, and, as appellants argue, the words “obtained by,” which precede the word “duress,” could be deemed to connote that any pressure existing upon the mother constituting duress must come improperly from someone else, not from within herself from the fear of criminal prosecution and jail. As indicated above, such a limitation of the definition of duress to legal duress so as to include only such externally applied improper pressure finds support in the general law. See, e.g., 20 Fla.Jur.2d Duress and Undue Influence (1980); 25 Am.Jur.2d Duress and Undue Influence § 1 (1966).
We do not apply that general law and depart from the previously established law of this case because, for the reasons we have explained, no manifest injustice to appellants can be said to have occurred under the properly considered circumstances of this adoption case by finding the natural mother’s consent to have been revoked.
But aside from those considerations calling for adherence to the law of the case, we will now refer to reasoning which may be asserted in favor of the inherent soundness of that law under the particular facts of this case. We do so, not as needed support for the affirmance on this appeal (since, as we have explained, the reason for this affirmance is separate and apart from the inherent nature of the law of this case) but for the edification of appellants, and others.
Why should not a single parent in circumstances like those of this natural mother, who was surely, as the trial court found, subjected to great pressure out of concern for her child if the mother went to jail, be entitled to revoke her consent a short time later before any would-be adoptive parents took custody of the child? Since the threat or existence of a criminal prosecution against a mother, by itself, is surely not a proper basis to conclude that the mother necessarily is unfit to be the parent of her child (and, in any event, as we have said, fitness of a natural mother is not in issue in an adoption proceeding like this), why should this natural mother’s circumstances be considered in this adoption case to be different in principle from those of any mother who, believing she will be required to go away for an extended period without her child for business or personal or health reasons, is distraught and irrationally signs an adoption consent form? Why should she not be able to effectively withdraw her consent a short time later where, as in this case, she did so before any would-be adoptive parents took custody of the child? Why, if a person agreeing in writing to purchase encyclopedias from a door to door salesman is entitled to cancel that agreement three days later, as is provided in section 501.025, Florida Statutes (1985), should not a natural mother be entitled to cancel one week later her consent to the permanent loss to her of the child to whom she gave birth? Also, was the natural mother’s consent under the circumstances of this case free from externally applied pressure? There is apparently no doubt that pressure was imposed upon her from the detective’s statement that she would be arrested. But that statement was not made to induce her to sign the adoption consent. Yet the trial court did conclude, as we have said, that her consent was otherwise “recruited to some extent.”
Thus, this case is not factually free from doubt as to voluntariness of the natural mother’s consent, and rational policy positions can be taken in favor of the law of this case established on the prior appeal[6]
*354 Also, there is precedent which can be cited in support of the law of this case. In 1986 in In the Matter of D. and D., 408 S.W.2d 361 (Mo.App.1966), the Missouri Court of Appeals, in affirming a trial court’s decision that a mother’s revocation of her consent to the adoption of her children was effective, applied much the same law.[7] In that case, the Missouri court put this kind of situation in focus by saying, “This appeal presents one of the most agonizing of all perplexities that can be cast upon mortal tribunals for determination — how best to resolve hostilities involving innocent children of tender years.” 408 S.W.2d at 362. The Missouri court decided that a natural mother’s consent to the adoption of her children could be, and was, properly revoked when the consent had been made under circumstances which the court described as “duress ‘by force of circumstances_’” 408 S.W.2d at 369. “A finding that [the mother] was subjected to duress ‘by force of circumstances’ when she signed the consent [was not] incompatible with the exercise of sound discretion [by the trial court].” Id. The Missouri court, in words strikingly similar to those of the Florida Supreme Court quoted above from Canakaris and Strazzulla, went on to say, “It is no mere legal cliche that appellate courts should defer to the findings of the trial court in cases of this character unless the record discloses a manifest abuse of judicial discretion.” Id.
The circumstances in that case, as the court recognized, did not technically involve what is generally called legal duress. The consent had been given “under the influence of apprehensions not amounting to legal duress,” Id., at a time where, due to marital difficulties, the mother had been “filled with apprehensions, frustrations and fears....” Id. Indeed, the circumstances in that case were apparently not even specifically found to have impaired the ability of the mother to make rational decisions, as the trial court in the case at hand concluded had occurred to the natural mother here. That Missouri case was decided under a statute providing that an adoption “consent shall be irrevocable without leave of the court” but “revocable if leave of court is obtained.” 408 S.W.2d at 365. The Missouri court pointed out that “adoption statutes are to be strictly construed in favor of the rights of natural parents and austerely applied where the situation involves de *355 struction of the parent-child relationship.” 408 S.W.2d at 366.
The Missouri court noted the “liberal salting” of the case law with language as to the welfare, i.e., best interests, of the child but indicated that that aspect is actually not determinative as to whether a mother’s consent to an adoption may be withdrawn. 408 S.W.2d at 366-67.
The Missouri court drew an analogy with the concept that “[rjelief from a mistake of fact is frequently an award of equity,” saying that “If a unilateral mistake of a material fact be grounds for equitable cancellation of an instrument containing a mis-description in a deed (13 Am.Jur.2d Cancellation of Instruments § 32, p. 524), how much more quickly will the conscience of a court be rallied to permit revocation of a consent mistakenly given which effects an unintended conveyance of one’s children!” 408 S.W.2d at 368. That same analogy may be drawn with Florida law. Under Florida law “relief in equity will be granted by way of rescission or cancellation of an instrument because of a material mistake of fact that is unilateral where it is made under circumstances that render it inequitable for the other party to have the benefit thereof. Equity may grant such relief to the complainant despite the fact that the other party did not by commission or omission contribute to the mistake....” 9 Fla.Jur.2d Cancellation, etc. § 30.
In the final analysis, the meaning of the word “duress” in Florida Statutes section 63.082(5) is a matter of legislative intent. Therefore, the interpretation of section 63.-082(5) which supports the law of this case is that the legislature did not intend that a matter like this should be controlled by rigid rules of law. In other words, that interpretation is that the legislature did not intend to limit the meaning of the term “duress” in section 63.082(5) to what the Missouri court in In the Matter of D. and D. called “legal duress” but intended that that term have a broader meaning so as to encompass what was called by that court “duress by force of circumstances.” That would be in recognition that the potentially permanent loss of a child to whom a mother gave birth goes to the deepest of human sensitivities. That this statutory interpretation is justified might be attributed to the way in which section 63.082(5) is worded. That section does not say that a consent to an adoption may be withdrawn only when the consent was obtained by fraud or duress. It says that such a consent may be so withdrawn “when the court finds that the consent was obtained by fraud or duress.” (Emphasis added.) This might be taken to indicate that the legislature contemplated an exercise of judgment by a court in its determination of whether fraud or duress should be found to exist, rather than the application of a rigid legal rule. In that sense Florida courts applying section 63.082(5) would weigh the justice and equities of a case in a way somewhat similar to the way the Missouri court did in In the Matter of D. and D..
This is not to say that that Missouri case may be taken to reflect Florida law. The Missouri statute gave much broader leeway to the courts in deciding when an adoption consent may properly be revoked than does section 63.082(5). But it is to say that the concept of duress by force of circumstances, which was enunciated in that case, appears to have been applied under the law of this case to the particular facts of this case which seem substantially more susceptible to such an application than those in In the Matter of D. and D. In that case the pressure on the natural mother came from her marital difficulties. In this case there had been expert psychological testimony of the mother’s impaired ability to make rational decisions as having emanated from the threat of imminent jail which would remove the mother from the child, and the trial court was concerned with the mother’s enhanced vulnerability through acts of a not disinterested party in recruiting the mother’s consent. Thus, while the law of this case did not represent this court subscribing to the holding of that Missouri case, that case, by having enunciated the concept of duress by force of circumstances, does support the law of this case by showing that the term “duress” contained in section 63.082(5) has a dimension beyond that of legal duress. *356 That dimension has, in our view, outer boundaries which should no less indicate impairment of the free will of a natural mother than do the circumstances of this case.
Also, the point could be made that it would not seem irrational for the legislature to have considered the shortness of the period between the time of the consent and its withdrawal to be relevant. In this case that period was about a week. Along those lines, the trial court said in the final judgment, “[T]he Mother acted with reasonable swiftness in revoking the consent given under duress. Had the Mother waited a substantial period of time, it is doubtful that her credibility would have been established as well as it is.” Yet, we should add that if there were to be a specific “cooling off period” during which a consent to an adoption may be withdrawn, similar in principle to that provided by section 501.025 for purchase agreements with door to door salesmen, that is a matter for the legislature to decide.
We have taken pains to point out what this appeal is about, i.e., whether the trial court abused its discretion in concluding that the new evidence was of the same nature as the prior evidence and whether the law of the case should be applied. We have also indicated reasoning in favor of the law of the case.
We now explain more specifically other aspects which appellants have argued but which, as we have said, this appeal is not about. One such aspect, which is an aspect which the prior appeal also was not about, is that reflected in the order of this court entered on January 21, 1987, which contained this court’s advice to appellants referred to near the beginning of this opinion. That order denied appellants’ request for review of a trial court order denying a stay of the transfer of the child’s custody to the natural mother pending this appeal. In that order this court referred to the motions then pending on this appeal, the denials of which are now the subject of this appeal, and noted “that some of the allegations of the motions for relief from judgment ... go to the fitness of the natural mother. The question of fitness, however, has not been determined by the trial judge, nor was it [properly] raised in the previous appeal, and is not [properly] before this court at this time.” Again, this has not been a suit to establish the unfitness or fitness of the natural mother. It has been a suit to establish whether she effectively consented to the adoption of her child.
What avenue, if any, was open to appellants with respect to allegations that the natural mother is unfit to have her child? An answer to that question, as also indicated near the beginning of this opinion, was given in that January 21, 1987, order. This court in that order pointed out the potentiality of another suit in which those allegations could properly be made by saying, “If appellants choose to raise the issue of unfitness of the natural mother, the law provides a remedy for them to make such challenge by way of a petition for dependency pursuant to Chapter 39, Florida Statutes. Chapter 39, F.S., makes provision for immediate relief under appropriate circumstances by the trial court.” Indeed, in the judgment the trial court had pointed out that “the rights of the natural parents certainly must be paramount to any other consideration [as to the best interests of the child] absent some question of depen-dancy [sic] under chapter 39.” Appellants may possibly have decided at some point that there would be no need for a chapter 39 proceeding if the natural mother’s revocation of her consent was ineffective and their petition for adoption was granted. But the petition was denied by the trial court’s judgment on May 15,1986, and that judgment was affirmed by this court on October 17, 1986. In a chapter 39 suit the best interests of the child would be inextricably involved.
This leads to another aspect of appellants’ contentions in their motions for post judgment relief which are not what either this appeal is, or the prior appeal was, about. That concerns the interests of the child. This has never been a suit to determine whether the interests of the child would be best served by the adoption rather than by the child remaining with her mother. As concluded earlier in this opin *357 ion in the summary of our reasons for affirming the denial of the motions for post judgment relief, the best interests of a child are not a statutory basis for making available the child for adoption from an unconsenting parent whose consent is required (which includes parents who have lawful custody of their children); to permit such interests to govern such an adoption could disrupt our society; and the issue of a child’s best interests is logically separate and apart from the issue of whether a natural parent consented to an adoption. We will now explain those conclusions.
We are not saying that the interests of a child are not at all involved in an adoption case. Of course they are because there must be a determination that the would-be adoptive parents are of such abilities and character as to serve the child’s interests. We presume that an affirmative such determination would have been made with respect to appellants in this case in accordance with HRS’s recommendation if the child had been found to be available for adoption. That aspect is not a contested part of this case. But in an adoption case a child’s interests are not determinative as to whether the child is properly available for adoption by reason of a consent to the adoption by the natural parent or parents.
Children should not be available for adoption in legal proceedings simply on the basis that a court might determine that someone else would best serve their interests as compared to their natural parents. If petitions for the adoption of minor children of unconsenting parents who have lawful custody of their children (which would describe almost all parents and their children) could properly be granted simply on the basis that the children would be better off with new parents, our society could be disrupted. Courts would then have the power to move a child from one family to another against the will of the birth parent or parents simply by deciding where the child would be better off.[8] Proof of whether or not someone other than a child’s natural parent would best serve the child’s interests has nothing necessarily to do with proving whether or not that parent consented to an adoption. The issue of consent is logically separate and distinct from the issue of the child’s best interests. Each issue requires proof of a nature not required for proof of the other issue. (Such testing of the requirements of proof is a method established by the legislature, and followed by the Florida Supreme Court, by which to determine in other contexts that issues are separate and distinct one from the other. Cf. Rotenberry v. State, 468 So.2d 971, 976 (Fla.1985); Taffer v. State, 504 So.2d 436, 438 (Fla. 2d DCA 1987)).
The adoption here would have been proper only if the mother had consented to it, i.e., if her child had been available for adoption because her revocation of her consent was not valid. This same type of conclusion was reached in 1980 on statutory construction grounds as to what the legislature meant when this court said in Solomon v. McLucas, 382 So.2d 339, 343 (Fla. 2d DCA 1980), that
*358 These findings and conclusions [as to the best interests of the child] do not provide a legally sufficient basis for terminating the rights of a natural parent by granting a petition for adoption without that parent’s consent.... Despite what this court and other Florida courts may have said in the past indicating that an adoption may be granted over the objection of a natural parent if it would serve the best interests of the child, since the passage of Section 63.072, Florida Statutes (1977) ... the grounds upon which adoption may be granted in the absence of the written consent of a natural parent whose consent is required are only those specified in that section. The best interests of the child is not one of them.
See also Ramos v. Sanabria, 429 So.2d 838 (Fla. 3d DCA 1983) (“A ‘best interest of the child’ test ... is totally inappropriate to permanently deprive [the natural father] of his parental rights.”); Matter of Adoption of Cottrill, 388 So.2d 302, 304 (Fla. 3d DCA 1980) (“The best interests of the child are not ... a factor which will obviate the necessity of consent to adoption....”); Matter of Adoption of Noble, 349 So.2d 1215, 1216 (Fla. 4th DCA 1977) (“We find no error in the determination that the [would-be adoptive parents] are fit and proper, nor do we question a finding that the child’s best interests may be promoted by awarding her custody to the [would-be adoptive parents]. We do, however, find that these standards, with nothing further, are insufficient to terminate parental rights permanently. Due regard must be given to the rights of a natural parent.”).[9]
Presumably the response to our comments as to the inappropriateness of a best interests of the child argument in this kind of case would be to the effect that the best interests of the child should be a factor, if not the determinative factor, in any case *359 involving the custody of a child, regardless of logic. But the point remains that the issue of whether there has been an adoption consent by natural parents is separate and apart from the issue of whether having new parents would be in the best interests of the child, and, if best interests of the child considerations could nonetheless properly be weighed in cases of this kind, those considerations could in effect outweigh a lack of consent thereby giving courts potentially awesome powers over natural parents.
The trial court in this case was also concerned with how best interests considerations in these kinds of cases, if considerations of that type could properly be weighed, might permit undesirable results. In that respect the trial court said in the final judgment that using best interests considerations “would ... encourage the use of questionable tactics to obtain the consent of a poor or mentally retarded natural Mother in order to fulfill the perceived value choices in favor of a child.” [10] We need not express a view as to that approach. But we will add that we feel sure the approach was concerned with general policy considerations and was not meant as a reflection upon appellants.
The solemn authority of the courts to permanently terminate natural parental rights without the consent of the natural parents should be limited to chapter 39 proceedings where, as we have noted, appropriate procedures, standards and safeguards are provided for and where, because unfitness of the parent is in effect a litigated issue, proof as to the best interests of the child would have to do with what is in issue.
We are aware that, as the Missouri court noted in In the Matter of D. and D., court opinions in adoption cases from time to time use in support of their holdings language that those holdings serve the best interests of the child. Certainly language of that kind serves to reinforce the validity of such opinions. And if a court would say that it does not care about the interests of a child, that would doubtless be received with shock and dismay at best. But, once again, this opinion does not say that. We are of course concerned with the interests of the child who is involved in this case. That concern is reflected in the observations earlier in this opinion, and in this court’s January 21, 1987, order, about the apparent lack of pursuing allegations of the natural mother’s unfitness by instituting a chapter 39 proceeding. In sum, we are saying that the best interests of the child are important but that, relative to the types of contentions appellants have made, that importance is determinative in chapter 39 cases in which natural parents are, without their consent, statutorily made subject to permanently losing their children. In any event, as Solomon and the other cases cited above point out, the legislature has not included the best interests of the child among the bases to disregard a lack of consent to an adoption on the part of competent parents who have lawful custody of their children.
Our sympathy for the feelings of appellants is certainly no less than that shown by the trial judge’s order now on appeal in which he said,
5. This Court fully appreciates the strong advocacy on the part of the Petitioners [appellants in this appeal]. The desire to find any avenue of hope must be exceedingly strong for them. It is most unfortunate that these folks [appellants], the Respondent [the mother] and the Child have suffered grieviously [sic] and unnecessarily because of the despicable, callous disregard of HRS personnel in placing the Child with the Petitioners in spite of the claims of the Respondent. If there is any question as to the particularly hienous [sic] nature of HRS activity in this regard, a review of [testimony of an HRS representative] demonstrates that HRS took it upon themselves to interpret the law and give the Petitioners the “choice” of trying to live with an *360 adverse ruling. Properly, the Child should have been placed with foster parents — people trained to deal with temporary custody — rather than with the very persons whom HRS representatives would know would come to love the Child and suffer irreparably in the event the Court ruled against them. It is a sad commentary that social workers can act so arbitrarily and with such lack of understanding of human nature and then excuse such behavior by saying it was the Petitioner’s choice to live with the decision.
6. Unfortunately, the law is clear. Only the Court (and not HRS) determines if a consent was obtained under duress. Once that finding is made, the petition for adoption is a nullity.
Being appreciative, as was the trial judge, of the vigor of appellants’ advocacy and the depth of their feelings, we would not find it difficult to understand their inability to be satisfied with the rulings of law on this appeal, on the prior appeal, and in the trial court and with anything less than victory. That would be by no means unusual on the part of one side at the end of a law suit. Yet we most certainly would understand in these poignant circumstances that what the trial judge, doubtless with accuracy, characterized as appellants’ grievous suffering is surely of a type and magnitude substantially more pronounced in intensity than the feelings of the losing parties in most law suits. We trust that nonetheless, deep down and through their veil of pain, appellants recognize that the rule of law must be followed and that the law controlling this appeal is clear. We hope they recognize reasoning in favor of the law of this case and why, in any event, we have concluded that no manifest injustice occurred in the trial court and on the prior appeal from applying that law under the properly relevant circumstances of this adoption case. We also trust they recognize the difficulty facing the trial judge and where, in the above quoted language in paragraph 5. of his order, he placed responsibility for their anguish. We express no view in that regard. But that is something as to which appellants evidently have personal knowledge since, as we have said, they apparently knew when they took custody of the child that the mother’s consent had been withdrawn.[11]
The trial court’s order denying the motions for post judgment relief is affirmed.
DANAHY, C.J., and RYDER, J., concur.

. At the time the judgment was entered appellants had had custody for approximately eight months. As a result of their requests for a stay of the transfer of custody of the child, custody was not transferred to the natural mother until approximately eight months thereafter.

. They also argued that the mother's testimony to the court had been fraudulent, but the trial court found that she had "presented no false testimony that would warrant setting aside the judgment."

. For these purposes it is of no consequence that the prior affirmance by this court was a so-called PCA, i.e., an affirmance without a written opinion. PCAs establish the law of the case for the parties in subsequent proceedings in the same case, see Red Carpet Corp. v. Roberts, 443 So.2d 377, 399 (Fla. 1st DCA 1983), and an appellate court certainly can perceive what the law was that it applied in a PCA.

. The new evidence included information regarding the natural mother’s encounters with the criminal justice system in California and aspects of her activities subsequent to the judgment, such as her changes of jobs and residences and her conduct leading to her arrest.

, The record contains a psychological evaluation of the mother which concluded that she wanted the child very much.

. Of course, a court’s conclusion of rationality of a particular statutory meaning is not a proper basis on which to construe a statute as having a meaning contrary to that manifested by the leg *354 islature. But rationality can be used as a guide when that intent is subject to interpretation. See Wakulla County v. Davis, 395 So.2d 540, 543 (Fla.1981).
We have obtained and examined a copy of the House Staff Report concerning the Florida Adoption Act as enacted in 1973. That report does not contain any manifestation as to any particular meaning of the term "duress” intended by the legislature to be encompassed within that term as used in section 63.082(5). Apparently no Senate Staff Report in that regard is available.
We recognize that there are policy positions which can be taken which are contrary to the position described above in support of the law of this case. For example, the position may be taken that virtually any natural mother of a child would face pressure of some kind in making a decision whether or not to consent to the adoption of her child. Accordingly, that position would be that, unless the type of duress permitting revocation of such a consent is limited to legal duress, no adoption consent could be relied upon as binding.
Certainly this is a difficult subject involving debatable, conflicting policy considerations. It may well be that in a sense the debate finally turns upon a philosophy as to whether natural parenthood or the encouragement of adoptions is of greater importance to the well being of society. But we do not employ either such philosophy in affirming on this appeal. In the posture of this appeal in which, as we have said, we have concluded that we must follow the law of the case and we are describing reasoning in support of that law as observations, we need not further address that debate. But we should point out again that this appeal has been considered under the particular facts of this case. The position that under the law of this case no adoption consent could be relied upon as binding would not seem tenable. No other case has been cited to us, nor are we aware of any, which was decided under closely comparable facts.

. We recognize that there are cases to the contrary. See Annot., 74 A.L.R. 3d 527 (1976). But, again, we are not aware of any case contrary to the law of this case under facts comparable to those of this case. Nor do we conclude that the language of the courts in the Florida cases cited by appellants on their prior appeal requires a contrary result or that those cases were decided under comparable facts. Indeed, the facts of this case appear to be substantially stronger in favor of a finding of duress than those in In the Matter of D & D.

. While Small v. Andrews, 20 Or.App. 6, 530 P.2d 540 (1975), was decided under an Oregon statute giving a natural parent the right to revoke an adoption consent at any time before a decree of adoption is entered, that case contains several statements by the Oregon Court of Appeals which are not irrelevant to this case. The Oregon court, quoting from a prior Oregon case, said that "... courts should not interfere with the natural relationship of parent and child upon the sole ground that the proposed adoptive parents are able to give the child superior advantages over those within the means or social status of the natural parents_" Id. 20 Or. App. at 544. The court went on to say,
Where, as here, a natural mother not represented by legal counsel at the time consent is given attempts to withdraw that consent within a few weeks and thereafter takes reasonable steps available to regain the custody of her child, neither so-called "vested rights" nor superior economic or social position of the proposed adoptive parents will serve to deprive that withdrawal of legal effect.
The hardships produced by a separation of the child and the petitioners [the would-be adoptive parents] at this time are in substantial measure the result of the petitioners’ resistance to the natural mother’s efforts to regain custody. Those hoping to become adoptive parents cannot create their best argument for keeping a child’s custody by thwarting a natural parent’s known wishes.
Id. 20 Or.App. at 544-45.

. An additional observation we should make is that we do not conclude that the opinion in In re Adoption of Cox, 327 So.2d 776 (Fla.1976), which had been issued well before Solomon was decided, would have required that the best interests of the child be determinative. Cox did speak approvingly of the trial court’s conclusion that the best interests of the child were served in that case by granting the adoption. But in Cox, unlike this case, the would-be adoptive parents had had custody of the child under the aegis of the natural mother’s unrevoked consent. Here, as is indicated in an above quoted portion of the trial court’s order, appellants apparently knew when they took custody that the mother’s consent had been withdrawn. In Cox the natural mother did not attempt to revoke her consent until at the court hearing on the petition for adoption. Under those circumstances the consent in that case was found to be valid. "[I]n the absence of fraud or duress a consent freely and voluntarily given is irrevocable." Id. at 777-78. Cox evidently involved a situation "where a natural mother seeks the return of her child after she has bettered her position to care for the child and has reconsidered her original motives for allowing the adoption_” Id. at 778. Thus, in that case, where there did not appear to be any basis or justification for the revocation of the consent and the natural mother had apparently permitted the would-be adoptive parents to develop emotional ties with the child, the trial court’s consideration of the best interests of the child was favorably referred to by the supreme court.
Cox is another case in which the supreme court referred to the deference to be given to trial court determinations, saying, "We recognize the difficulties inherent in making a decision in matters of this nature, and we are most reluctant to substitute our judgment (or let the district courts substitute their judgments) in the resolution of these emotionally-charged matters." Id. at 778.
There is language in the Cox opinion that fitness of the natural mother and the child’s best interests are factors. But Cox made no mention of section 63.072 which apparently was not argued in that case and which, as Solomon later pointed out, does not permit an adoption to be granted on the basis of the child’s best interests in this type of case. Nor did Cox refer to other aspects discussed in this opinion which presumably were not argued in that case. And there is no reference to Cox in Solomon, Ramos, Cottrill and Noble. Thus, taken in context, we must conclude that the supreme court’s references in Cox to the child’s interests should be taken as buttressing the validity of the conclusion otherwise reached that the mother in that case had consented to the adoption. Again, this is not to say that a child’s interests may not be considered in a situation where those interests are in jeopardy. (See the references supra to chapter 39, Florida Statutes.) It is only to say that they are not determinative in this adoption suit in which the issue is only whether the mother consented.
As indicated in Solomon, the legislature, if it had wished, could have provided different grounds upon which an adoption could be granted in situations where there is no consent of a parent.

. The natural mother in this case was of limited financial ability as well as intelligence although she possessed a G.E.D. and at the time of the adoption hearing was one week from completing a real estate school.

. While HRS apparently was not looking out for the feelings of the appellants in the event the mother's revocation of her consent should be determined to be valid, HRS apparently did not recognize that possibility. HRS was, nonetheless, looking for a stable home for the child and was therefore obviously looking out for the child.